IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED
AUG 1 0 2018
Clerk, U.S District Court
District Of Montana
Missoula

| | |
|---|---|
| STEPHEN MCCOY,<br><br>Plaintiff,<br><br>vs.<br><br>SALISH KOOTENAI COLLEGE, INC.,<br><br>Defendant. | CV 17–88–M–DLC<br><br>ORDER |

Before the Court is Salish Kootenai College, Inc's (the "College") Motion to Dismiss. (Doc. 12.) Plaintiff Stephen McCoy ("McCoy") opposes the Motion. Amici Confederated Salish and Kootenai Tribes and the American Indian Higher Education Consortium have joined in support of the Motion. For the reasons explained below, the Court grants the Motion.

## BACKGROUND

McCoy filed his Complaint in this Court on June 26, 2017, asserting two claims: a sex-based discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and a sex-based discrimination claim under the Montana Human Rights Act, Mont. Code Ann. § 49–2–101 et seq. (Doc. 1)

McCoy asserts this Court has jurisdiction because Title VII presents a federal question. (Doc. 1 at 1–2.) The College moved the Court to enter a scheduling order for jurisdictional discovery because the Court lacks jurisdiction if the College is an arm of the Confederated Salish and Kootenai Tribes (the "Tribes"). (Doc. 4.) The Court granted the unopposed motion, and the parties have now engaged in jurisdictional discovery. (Doc. 5.) The College filed its Motion to Dismiss on February 2, 2018. (Doc. 12.) A hearing was held regarding the Motion to Dismiss on August 7, 2018, and all parties were heard, including Amici.

During the pendency of this case, the Ninth Circuit issued an opinion similar to this matter on July 10, 2017, in *United States ex rel. Cain v. Salish Kootenai College, Inc.*, 862 F.3d 939 (9th Cir. 2017). The Ninth Circuit instructed the district court to determine on remand whether Defendant Salish Kootenai College, Inc. functions as an arm of the Confederated Salish and Kootenai Tribes "and therefore shares the Tribe's sovereign status" for purpose of the False Claims Act, 31 U.S.C. §§ 3729-3733. *Cain*, 862 F.3d at 943. The Ninth Circuit directed the district court to determine the College's status by analyzing the relationship between the College and the Tribe using the factors described in *White v. University of California*, 765 F.3d 1010 (9th Cir. 2014). Subsequently, on May 17, 2018, United States District Court Judge Morris entered a Memorandum and

Order granting the College's Motion to Dismiss in accordance with the *White* factors. *Fawn Cain, Tanya Archer, and Sandi Ovitt v. Salish Kootenai College, Inc. et al.*, Case No. CV-12-181-B-BMM, Doc. 108 (May 17, 2018).

## LEGAL STANDARD

As a court of limited jurisdiction, the federal court is presumed to lack subject matter jurisdiction unless the party asserting jurisdiction establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When a defendant moves to dismiss a case for lack of subject matter jurisdiction, the plaintiff has the burden of proving by a preponderance of the evidence that the court possesses jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) ("When the defendant raises a factual attack [on subject matter jurisdiction], the plaintiff must support her jurisdictional allegations with 'competent proof.'"); *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009). Unless the plaintiff satisfies this burden, the case must be dismissed.

The Court lacks subject matter jurisdiction if the College is determined to be a tribal entity that functions as an arm of the Confederated Salish and Kootenai Tribes ("the Tribes"). Tribal sovereign immunity extends to business activities of the tribe, not merely governmental activities. *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) (citations omitted). "The question is not whether

the activity may be characterized as a business . . . but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe." *Id.* The Ninth Circuit developed a five-factor test to determine whether a business functions as an "arm of the tribe" such that it is entitled to sovereign immunity. *White*, 765 F.3d at 1025 (citing *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010)). A district court must examine:

> (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.

*Id.*

"An entity asserting immunity as an arm of a sovereign tribe must show by a preponderance of the evidence 'that it is, in fact, an arm of the tribe.'" *Dahlstrom v. Sauk-Suiattle Indian Tribe*, No. C16-0052JLR, 2017 WL 1064399, at *3 (W.D. Wash. Mar. 21, 2017) (citing *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F. Supp. 2d 442, 466 (E.D.N.Y. 2009) (holding that the requirement that a business be licensed by the tribal council because it was on tribal grounds was insufficient to demonstrate that the business was an arm of the tribe)).

## ANALYSIS

If the College is deemed an arm of the Tribes, it therefore shares in the Tribes' sovereign status and is not an "employer" that is subject to suit under Title VII, and the Court would also lack jurisdiction over the state law claim because the College shares in the Tribes' sovereign immunity and the tribal court would have exclusive jurisdiction over the claim.

Title VII prohibits employers from engaging in discriminatory practices. However, Indian tribes are not "employers" who may be sued under Title VII because they are excluded from the statutory definition of "employer." 42 U.S.C. § 2000e(b) ("The term 'employer' . . . does not include (1) . . . an Indian tribe. . . ."). An entity that functions as an arm of a tribe likewise "falls within the scope of the Indian Tribe exemption of Title VII." *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185, 1188 (9th Cir. 1998). In *Pink*, the Ninth Circuit held the plaintiff could not bring suit under Title VII against her former employer, a nonprofit corporation organized by two tribes to provide health services to tribal members. *Id.* The corporation was excluded from the reach of Title VII because it "served as an arm of the sovereign tribes, acting as more than a mere business." *Id.*

Application of the *White* factors to the undisputed facts establishes that the

College functions as an arm of the Tribes. The Court provides the following analysis related to each factor.

I.  **The Method of Creation of the College**

The College argues that the method and creation of the College are intertwined with the Tribes. Although McCoy insists that the state-incorporated College is a different entity than the tribal-incorporated College, the incorporation status does not divest the College of its tribal status. *See Smith v. Salish Kootenai College*, 434 F.3d 1127, 1134 (9th Cir. 2006).

The College sits on tribal land on the Flathead Indian Reservation. The Tribal Council chartered and established the College on November 18, 1977, pursuant to its governmental authority under §16 of the Indian Reorganization Act, 25 U.S.C. § 476, and the Tribe's Constitution. (Docs. 13 at 9; 13-2; 13-3). The College was originally incorporated under tribal law as a tribal non-profit corporation. (Doc. 13-3.) The College is the Tribes' sole tribal college, is accredited by the Northwest Accreditation Commission (NWCCU), and is recognized as a "tribally controlled college" by the federal government. (Doc. 13-4.) In September 1978, the College was also incorporated under Montana law. (Doc. 13-5.) Nonetheless, state incorporation or dual incorporation does not divest a tribal corporation of its tribal status. *Smith*, 434 F.3d at 1129.

Consequently, the first *White* factor supports a finding that the College functions as an arm of the Tribes.

## II. The Purpose of the College

Next, the College argues that the purpose the College mirrors those of the tribal college movement: tribal autonomy, self-governance, and self-determination. (Docs. 13 at 17; 25 at 6–7.) McCoy counters that the College's purpose as stated in its Articles of incorporation establish that it was neither created for the financial benefit of the Tribes or to aid in the Tribes' self-governance. (Doc. 22 at 11.) McCoy also argues that the enrollment in the College only reflects approximately 28% from the Tribes. (Doc. 22 at 13.)

The Court finds the College's purpose intrinsically involved in that of the purpose of the Tribes. As reflected in the Tribal Resolution and Tribal Charter establishing the College, the College serves at least three primary purposes: (1) to represent develop, protect and advance the views, interests, resources, and education of the Tribes (Doc. 13-3 at 1); (2) to provide post-secondary education opportunities for Native Americans on the Flathead Indian Reservation (Doc. 13-3 at 4–5); and to "upgrade the skills and competencies of [tribal] employees" (Doc. 13-3 at 2). Thus, it is apparent the purpose of the College was for the Tribes to become completely self-sufficient and educate their own people.

The College further provides tuition for enrolled members of the Tribes at no cost the first year, and for additional years for those who maintain a good GPA. (Docs. 13 at 18; 13-10.) The College also plays a vital role in preserving the cultural and language traditions of the Tribes in its curricula. (Docs. 13 at 19; 13-11.)

Thus, the second *White* factor weighs in favor of finding the College functions as an arm of the Tribes.

### III. The Structure, Ownership, and Management of the College, Including the Amount of Control Exercised by the Tribes

The College argues that there is a deep connection between it and the Tribes because the Council has maintained an active role in the College for four decades, consistently exercised its authority to appoint College Board members, and enmeshed the College in the Tribes' governmental, educational, health, scientific, and environmental programs. McCoy counters that the College's Articles of Incorporation make no reference to the Tribes control over the corporation, or any powers reserved to the Tribes. (Doc. 22 at 15.) Further, McCoy claims that the College's choice of accreditation with NWCCU critically defeats that it is an arm of the Tribes.

#### A. Governing Board

As indicated in the Articles of Incorporation, the College's Board of Directors handles the governing and day-to-day operations of the College. (Doc. 13-12.) The Tribal Council appoints and removes Board members—all of whom must be enrolled members of the Tribes—and has the right to review Board actions. (Doc. 13-3.) Separate governance does not divest the College of its tribal character, rather, the degree of control and the "structure" of the relationship are relevant. *Smith*, 434 F.3d at 1133. While the Board controls the operations of the College, the Tribes control who is a Board member and review the Board actions. Thus, the College in this respect acts as an arm of the Tribes.

The Tribal Council's delegation of governance over the College is required for the College to be a "tribally controlled college" under the Tribally Controlled Colleges and Universities Assistance ("TCCUA"), which requires tribal colleges to be accredited in order to receive assistance. 25 U.S.C. § 1804. The NWCCU accredited the College. Accreditation standards mandated by the NWCCU require that the College possess its own governing board and operate with "appropriate autonomy." *See* NWCCU Accreditation Standards Std. 2A, 2A23, www.nwccu.org/accreditation/standards-policies/standards/. The Tribes and the College carefully preserve this "appropriate autonomy," because without it, the College would lose its accreditation and its primary funding source.

McCoy's argument that the College's "choice of accreditation" precludes it from being an arm of the Tribes is unpersuasive. If his position was correct, every accredited tribally controlled college would be at risk of losing its sovereign status by virtue of its compliance with accreditation standards that require appropriate autonomy. Thus, the Court finds that accreditation is necessary and it does not impact the overall connection of the College to the Tribes.

### B. The Tribes Treat the College as a Component of the Tribes

The Tribal Council treats the College as a component of the Tribe and more than "mere business." *Pink*, 257 F.3d at 1188–89. The Tribes have advocated for the College at state and federal levels, and represented to federal agencies that the College is a "tribally controlled" entity that is eligible for funding for tribes. Further, the College is designated a "political subdivision" of the Tribes with the Internal Revenue Service, and the College's independent auditors treat the College as a "component unit" of the Tribes under Governmental Accounting Standards Board Statement 39. (Doc. 13-13.)

While maintaining appropriate autonomy, the College acts essentially as a department of the Tribes. The Council regularly passes resolutions demonstrating support for the College's grant applications, appoints the College to tribal committees and sometimes even calls it a department, and grants the College

special permits to use tribal land and other resources and to conduct research on the Reservation. (Doc. 13-1.) The College also operates the tribal library. All of these factors establish that the Tribes treat the College not as an independent entity, but rather an arm of the Tribes.

### C. The College recognizes its subsidiary relationship with the Tribes

Finally, the College recognizes its subsidiary relationship with the Tribes. The College's policies reflect that the College's Board serves at the discretion of the Tribal Council. All goals, objectives, and policies of the Board are required to be consistent with the guidelines established by the Tribes. (Doc. 13-9.) Further, the College's hiring guidelines assign priority to enrolled members of the Tribe and to first generation descendants of the Tribe. (Doc. 13-9.)

Consequently, in regard to the structure, ownership, and management of the College, including the amount of control exercised by the Tribes, the third *White* factor weighs in favor of the College functioning as an arm of the Tribes.

### IV. The Tribe's Intent to Share its Sovereignty with the College

The Tribe has demonstrated its intent to share sovereignty with the College in a number of ways. The Tribal Council chartered and established the College pursuant to its governmental authority under Section 16 of the Indian Reorganization Act. Tribal sovereign immunity may extend to a Section 16 entity

that functions "as an arm of the tribe," including a for-profit or non-profit corporation chartered under state or tribal law. *See Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006). Moreover, the Tribes expressly limit the College's power to sue and be sued in Tribal Court. (Doc. 13-3, Tribal charter SKC034896.) And, most critically, the Tribes' Court of Appeals has recognized that the College is "the pride of the Salish-Kootenai people," that "[e]ducating tribal members is an important component of self-government," and that the College "is a tribal entity closely associated with and controlled by the Tribes." (Doc. 13-17, *Smith v. Salish Kootenai College*, AP-99-227-CV (CSKT Ct. of Appeals 2003).) The Tribes have also expressly stated in this lawsuit that the College functions as an arm of the Tribe.

McCoy contends that (1) the Articles of Incorporation are silent as to sovereign immunity, (2) the 2016 version of the Policy Manual provides the College can sue and be sued in federal court as well as tribal court, and (3) the College has executed contracts assuring it will be compliant with federal nondiscrimination laws. First, waiver of sovereign immunity is not part of the analysis, and regardless there has been no waiver. Further, the College's power to sue or be sued in either federal or tribal court is limited by whether it is subject to suit under certain statues and whether its immunity has been waived. Finally,

contractual agreements with the United States to comply with nondiscrimination laws does not unequivocally waive soverign immunity or create a private right of action. Thus, McCoy's argument are meritless.

Consequently, the fourth *White* factor supports a finding that the College is an arm of the Tribe.

## V. The Financial Relationship Between the Tribe and the College

Finally, the Tribes and the College are financially interconnected. The College would not be eligible for its primary funding source were it not for the Tribes' charter and ongoing sanction. (Docs. 13 at 32–33; 13-13, Audits SKC031508–31509, 31511.) The Tribal Council also frequently applies for funding on behalf of the College and passes the grant funds through to the College. (Docs. 13 at 32–33; 13-1.). It has also designated the College as eligible to receive ISDEAA funds, which are only available to tribes and tribal organizations. *See* 25 U.S.C. § 5322. The Tribes have designated the College a tribal entity for various PL 93-638 "self-determination" contracts. (Docs. 13-1 Demonstrative § V(A)(1); 13-2, Council SKC006120–6121, 15667–15670, 27599–27600.) Further, the Tribe has made financial contributions to the College, and the tribe has leased trust land to the College. (Doc. 13-34–35.) Finally, as a nonprofit corporation, the College reinvests any profits into its education mission, furthering

the mission of the Tribes. (*Id.*)

McCoy contends that the Tribe avoids liability for any judgment against the College due to the fact the College operates as a corporation with a separate legal status. (Doc. 22 at 20.) The Ninth Circuit rejected that argument that the tribal sovereignty test turns on whether the tribe is directly or functionally liable for monetary judgment. *Cain*, 862 F.3d at 944 (citing *Stoner v. Santa Clara County Office of Education*, 502 F.3d 1116, 1122–23 (9th Cir. 2007)). McCoy also argues that as a nonprofit, the College does not economically benefit the Tribes or fund the tribal governmental functions. (Doc. 22 at 20–21.) However, simply because the College is not profitable for the Tribes does not mean the two entities are not financially connected. The Tribes benefit from post-secondary education and the financial stability of the College is critical to the Tribes objective to maintain their self-sufficient society.

Thus, the fifth *White* factor supports a finding that the College qualifies as an arm of the Tribes.

## CONCLUSION

The Court finds that all five *White* factors support that the College functions as an arm of the Tribe. Consequently, the College shares in the Tribe's sovereign immunity given its status as an arm of the Tribe. The College is not subject to

suit under the Title VII and the College shares in the Tribe's sovereign immunity. Therefore, the Court lacks subject matter jurisdiction over the claims asserted against the College and tribal court has exclusive jurisdiction over the state law claim.

Accordingly, IT IS ORDERED the College's Motion to Dismiss (Doc. 12) is GRANTED. McCoy's claims against the College are DISMISSED for lack of subject matter jurisdiction.

Dated this 10th day of August, 2018.

Dana L. Christensen, Chief Judge
United States District Court